UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RICKY D. JOHNSON, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Case No. 1:14-cv-49-LJM-DML |
| CORIZON MEDICAL SERVICES INC., et al., | ) ) ) |
| Defendants. | ) ) |

**Order on Corizon Defendants' Motion for Summary Judgment**

Plaintiff Ricky Johnson, an inmate of the Miami Correctional Facility, brings this civil rights action alleging that he received constitutionally inadequate medical care for a broken hip while housed at the Pendleton Correctional Facility, Wabash Valley Correctional Facility, and the Miami Correctional Facility. He seeks compensatory and punitive damages. Defendants Corizon, LLC ("Corizon"), Mary Blomquist, and William Wolfe (collectively, the "Corizon Defendants") move for summary judgment. For the following reasons, the Corizon Defendants' motion for summary judgment [dkt 40] is **granted in part and denied in part**.

**I. Summary Judgment Standard**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by[ ] ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P.

56(c)(1). The moving party has an initial burden of informing the court of the basis for the motion and showing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). If the non-moving party will bear the burden of proving the material issue at trial, then in order to defeat summary judgment, he must respond by going beyond the pleadings, and by his own affidavits, or by the discovery on file, identify facts sufficient to establish the existence of a genuine issue for trial. *See id.* "No genuine issue of material fact exists if a party has failed to 'make a showing sufficient to establish the existence of an element ... on which that party will bear the burden of proof at trial.'" *Id*.

## II. Undisputed Facts

On the evening of August 3, 2012, Mr. Johnson felt a sharp pain in his lower back and left hip after lifting property carts and ice barrels at his utility job. On August 7, 2012, Mr. Johnson presented to Nurse Blomquist, R.N., with complaints of hip pain and right knee pain and requested X-rays. As part of the nursing protocol, Nurse Blomquist completed the "SOAP notes"[1] upon her initial examination of Mr. Johnson. Mr. Johnson describes this exam as "cursory." The Objective component of the SOAP notes includes vital signs, findings from physical examinations, and observations made by other health professionals. Based on her observations, Nurse Blomquist noted that Mr. Johnson's knee was not tender, discolored, numb, or swollen, his range of motion was within normal limits, and his gait was normal.[2] She referred Mr. Johnson to Dr. Wolfe and requested x-rays.

---

[1] "Soap" is an acronym for Subjective, Objective, Assessment, and Plan. The Subjective component is the patient's chief complaint and the patient's stated purpose of the office visit. The Objective component includes vital signs, findings from physical examinations, and observations made by other health professionals. The Assessment is a nursing diagnosis of the patient's symptoms. The Plan is what the health care provider will do to treat the patient's symptoms.

[2] Nurse Blomquist asserts that Mr. Johnson walked with apparent discomfort only when he was aware she was observing him and otherwise walked normally. Mr. Johnson disputes this and asserts that Nurse Blomquist would not have been able to observe him walking through the hall because her view would have been disrupted. Accordingly, this fact is in dispute, but will not be material to the deliberate indifference or negligence analysis.

On August 8, 2012, Dr. Wolfe saw Mr. Johnson, who complained that he had been experiencing hip pain, left shoulder pain, and right knee pain for two weeks. During the exam, Dr. Wolfe did not observe swelling of joints and observed minimal tenderness. Dr. Wolfe noted that the examination showed an over-exaggeration of pain, an exaggerated limp, and unremarkable objective findings. Mr. Johnson had full range of motion in his back, hips, knees, and shoulders without evidence of pain. Contrary to Dr. Wolfe's observation, Johnson states "there was definitely tenderness to the point of pain in his hips and knees" and that he was "in extreme pain." The right knee and shoulder examinations were unremarkable, despite Mr. Johnson's complaints of pain. Dr. Wolfe ordered x-rays and continued Mr. Johnson's Naproxen, with lifting restrictions for two weeks. After his initial examination of Mr. Johnson, it did not appear to Dr. Wolfe that Mr. Johnson had a broken hip, because he would expect patients with a broken hip to display consistent problems with range of motion, tenderness, swelling, and an inability to bear weight.

Mr. Johnson underwent x-rays on August 9, 2012. Dr. Wolfe did not personally examine the x-ray, but sent it to radiologist Dr. Eichelberger for examination. Dr. Eichelberger's August 13, 2012 report indicated that the x-rays showed no evidence of a fracture or significant degenerative change in either hip, although there were some fairly severe lumbar degenerative changes noted. Dr. Wolfe relied on Dr. Eichelberger's x-ray report in concluding that Mr. Johnson did not have a fracture at that time.

On August 24, 2012, Mr. Johnson reported to Dr. Wolfe that he fell the night before getting out of the shower and had been on crutches with some weight bearing. Dr. Wolfe ordered a medical lay-in with meals and medications delivered for one month, scheduled Mr. Johnson to be seen by chronic care, continued Naprosyn, and ordered Tegretol for pain. Dr. Wolfe noted that x-rays

showed degenerative joint disease of the hip and spine, and, at this time, he believed that Mr. Johnson's complaints were a continuation of problems reported in early August.

On September 17, 2012, Mr. Johnson indicated that he was still not able to put weight on his left leg/hip/knee, and that Naprosyn and Tegretol did not help. Mr. Johnson indicated that he felt he had a torn tendon, ligament, or muscle. He complained that his hip bone was protruding out and the pain was across his lower back through his left buttock to his hip, down the side, to the knee and calf. Mr. Johnson was scheduled for a clinic visit.

On September 24, 2012, Dr. Wolfe saw Mr. Johnson for continuing left thigh pain and inability to stand on his left leg. While Dr. Wolfe noted improvement in Mr. Johnson's back and leg/hip pain during a four-week lay-in, Johnson states that he was still in extreme pain. An examination showed minimal left leg tenderness, but instability on weight bearing, and passive movement in thigh, but self-limitation to 20 degrees of flexion. Dr. Wolfe stated that he would renew the medical lay-in for two months, and he also continued then-current medications, which included Naprosyn and Tegretol for pain and inflammation. Dr. Wolfe attributed Mr. Johnson's instability on weight-bearing to spinal nerve compression, as Mr. Johnson's hip did not exhibit swelling on this visit.[3]

On November 9, 2012, Dr. Wolfe saw Mr. Johnson, who complained of persistent left thigh pain, weakness, and atrophy over the past three months. Mr. Johnson had a five-centimeter deficit in thigh circumference on the left, although his calf circumferences were equal bilaterally. He was unable to stand without support due to left leg weakness, and Dr. Wolfe noted that the August x-rays of his knee and hip were normal. Dr. Wolfe noted that he would request an MRI of the

---

[3] Mr. Johnson points out that the medical records do not reflect that Dr. Wolfe attributed Mr. Johnson's pain to nerve compression at this time, but does not otherwise support this challenge to Dr. Wolfe's sworn testimony with his own evidence.

lumbosacral spine. As of November 9, 2012, Dr. Wolfe believed that Mr. Johnson's atrophy suggested that his issue was nerve-related, in that there was insufficient stimulation of the muscles. When nerves are blocked, they do not stimulate the muscles, and the muscles in turn lose their shape and size.

An MRI was conducted on November 23, 2012, which revealed found degenerative disk disease and spondylosis. On November 30, 2012, Dr. Wolfe requested an outside neurology evaluation of Mr. Johnson's left leg atrophy and abnormal MRI, which was approved. Dr. Wolfe noted that: (1) Mr. Johnson's August x-rays of his hip and knee were normal; (2) Mr. Johnson could not walk without crutches; (3) Mr. Johnson had left thigh pain, weakness, and atrophy over the past four months; and (4) the presumed diagnosis was progressive muscular atrophy.

On December 5, 2012, the offsite scheduler noted that she emailed the hospital for a neurological consultation. At that time, Mr. Johnson had a prescription for Naprosyn through January 19, 2013. On December 10, 2012, Dr. Wolfe saw Mr. Johnson for continuing left leg, back, and hip pain. Dr. Wolfe noted that Mr. Johnson had an abnormal CT scan and that a referral to hospital neurology was in the works. He extended Mr. Johnson's medical lay-in for 60 days and continued Naprosyn. On December 18, 2012, Mr. Johnson was set for an offsite neurosurgery consult for January 2, 2013 by Dr. Wolfe's order. However, there were difficulties locating a neurosurgeon who would treat inmates. There were no such neurosurgeons in Anderson, but one was found in Terre Haute. That neurosurgeon was not available, however, so Mr. Johnson ultimately visited an orthopedist.

On December 19, 2012, Mr. Johnson stated that Naprosyn, Meloxicam, Pamelor, and Tegretol did not work for his pain. He requested something other than a non-steroidal, anti-inflammatory drug for pain, such as Neurontin, Ultram, or Vicodin. Dr. Wolfe responded that

narcotics and addicting medications are not appropriate for chronic pain and Neurontin, Vicodin, and Ultram were not suitable for Mr. Johnson at that time. As of December 19, 2012, Dr. Wolfe still believed that Mr. Johnson had chronic pain secondary to disk compression, and the medications requested by Mr. Johnson lose their effectiveness quickly, are addictive, and are a security concern in prisons.

Mr. Johnson underwent x-rays by the orthopedist at the hospital, and the x-ray report from January 2, 2013 showed a left hip fracture. That same day, Dr. Wolfe ordered Vicodin twice per day for three days because, at that point, the hospital visit had confirmed the existence of a fractured hip, which was not a chronic pain issue. On January 3, 2013, Dr. Wolfe requested an orthopedic consult for surgery for a fractured hip. He noted that Mr. Johnson had fallen getting out of the shower in August and had been on crutches, and that he had preexisting left leg atrophy and spinal stenosis. Dr. Wolfe also noted that repeat hip x-rays at the hospital showed a hip fracture despite x-rays in August 2012 being negative. On January 4, 2013, Mr. Johnson requested extensions of his pain medications and to receive instructions from his orthopedic surgeon. Dr. Wolfe indicated that surgery was being scheduled as soon as possible, and that the initial x-ray did not find a fracture, but it could have developed to the point of being visible later.

On January 7, 2013, Dr. Wolfe saw Mr. Johnson and noted that he was complaining of severe pain from a fractured hip, which was scheduled for surgery. On January 18, 2013, Dr. Wolfe recommended medical idle, no work, and limited recreation in cell house, medical lay-in with meals and medications delivered, single cell and bottom range for six months due to hip fracture.

On January 29, 2013, Mr. Johnson was scheduled for orthopedic surgery on February 20, 2013. On January 31, 2013, Dr. Wolfe renewed Mr. Johnson's Vicodin for 30 days per Mr. Johnson's request. On February 20, 2013, an x-ray report from Terre Haute Regional Hospital

indicated a non-displaced left hip fracture. On that date, Mr. Johnson had surgery on the hip. The surgeon noted that follow up would be in one to two weeks with a walker, partial weight bearing, and dressing changes every 48 to 72 hours.

In February 2013, Mr. Johnson had orders issued by Dr. Wolfe for Aspirin, Hydrocodone, and Naproxen for pain. Beginning on the date of Mr. Johnson's February 20, 2013 surgery, Dr. Wolfe was no longer involved in Mr. Johnson's care, as Mr. Johnson was transferred to Wabash Valley and then Miami. Dr. Wolfe had no input regarding the length of Mr. Johnson's stay in the infirmary. On February 23, 2013, Mr. Johnson was discharged from the hospital with instructions that included following up with the orthopedic surgeon in two weeks, dressing changes every 72 hours, and ambulation as tolerated. The medication list from the hospital included Aspirin, Hydrocodone (Vicodin), and Naproxen. Mr. Johnson was admitted to the infirmary at Wabash Valley on February 23, 2013.

### III. Discussion

Defendants Nurse Blomquist and Dr. Wolfe move for summary judgment arguing that they were not deliberately indifferent or negligent to Mr. Johnson's serious medical needs.

A. *Deliberate Indifference*

The Eighth Amendment requires the government "to provide medical care for those whom it is punishing by incarceration." *Snipes v. Detella,* 95 F.3d 586, 590 (7th Cir. 1996) (quoting *Estelle v. Gamble,* 429 U.S. 97, 103 (1976)). The Eighth Amendment test is expressed in terms of whether the defendant was deliberately indifferent to the plaintiff's serious medical needs. *Williams v. Liefer,* 491 F .3d 710, 714 (7th Cir. 2007). "Accordingly, a claim based on deficient medical care must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition." *Arnett v. Webster,* 658 F.3d 742, 750 (7th

7

Cir. 2011). A medical condition need not be life threatening to qualify as "objectively serious"; it is enough "that a reasonable doctor or patient" would deem the condition "important and worthy of comment or treatment." *Hayes v. Snyder,* 546 F.3d 516, 523-24 (7th Cir. 2008) (quotation marks and citation omitted). Deliberate indifference exists only when an official "knows of and disregards an excessive risk to an inmate's health; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). Reasonable doctors can disagree about the proper course of treatment for a patient without violating that patient's constitutional rights. Mere differences of opinion among medical personnel regarding the appropriate course of treatment for a patient do not give rise to deliberate indifference. *Estate of Cole v. Fromm,* 94 F.3d 254, 261 (7th Cir. 1996).

1. <u>Nurse Blomquist</u>

Nurse Blomquist argues that she was not deliberately indifferent to Mr. Johnson's serious medical needs because Mr. Johnson did not have an objectively serious medical need at the time she examined him and that, even assuming Mr. Johnson had a serious medical need, she was not deliberately indifferent to any risk.

Nurse Blomquist examined Mr. Johnson only once, on August 7, 2012. She argues that based on her observations he did not suffer from an objectively serious medical need that day. She asserts that although Mr. Johnson complained of hip and knee pain, his knee was not tender, discolored, numb, or swollen, his range of motion was within normal limits, and his gait was normal. She also states that although Mr. Johnson grimaced when he noticed that Nurse Blomquist was observing him walk, he had not been walking that way when he came into the medical department, and was again walking normally when he left after the examination. But Mr. Johnson

had presented evidence that he was in severe pain. Severe pain constitutes a serious medical need sufficient to satisfy the first element of the deliberate indifference test. *See Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976). Accordingly, there is a genuine issue of material fact regarding whether Mr. Johnson suffered from a serious medical need.

Nurse Blomquist goes on to argue that even if Mr. Johnson presented a serious medical need, there is no evidence that she was deliberately indifferent to that need. Nurse Blomquist thoroughly examined Mr. Johnson and referred him to Dr. Wolfe for x-rays. Mr. Johnson argues that Nurse Blomquist's note suggesting that he was exaggerating his injuries set the tone for how other medical staff would treat him. But there is no evidence that Mr. Johnson received sub-standard care as a result of this observation. While Nurse Blomquist did note Mr. Johnson did not seem to be in pain and seemed to be able to walk, she examined him and referred him to Dr. Wolfe. It is therefore undisputed that Nurse Blomquist did not disregard any excessive risk to Mr. Johnson's health. *See Farmer*, 511 U.S. at 837. She is therefore entitled to summary judgment on Mr. Johnson's deliberate indifference claim.

    2. Dr. Wolfe

Dr. Wolfe argues that even assuming that Mr. Johnson's broken hip was an objectively serious medical condition, he was not deliberately indifferent to that need. In support, Dr. Wolfe argues that although he was aware of Mr. Johnson's pain, he was not aware that his hip was fractured until a second x-ray on January 2, 2013 confirmed the fracture. Dr. Wolfe argues that he treated Mr. Johnson based on his reasonable belief that he was suffering from nerve damage, not a hip fracture. Dr. Wolfe also argues that his course of treatment for what he suspected was pain caused by nerve damage, which included lay-ins, pain medications, ordering x-rays, an MRI, and a CT scan, and requesting consultations with outside specialists was appropriate. Dr. Wolfe goes

on to assert that the fact that he saw Mr. Johnson many times over the course of five months indicates that Dr. Wolfe did not disregard any risk to Mr. Johnson, but rather provided continuous treatment. Mr. Johnson argues that Dr. Wolfe reached a number of different diagnoses for his pain over the course of his treatment and that Dr. Wolfe ignored his requests for different medications to treat the pain and for repeat x-rays. He also argues that the delay in treating his hip fracture and persistence in a course of treatment that was not successful amounts to deliberate indifference

Here, the initial x-ray report from August 13, 2012 indicated that Mr. Johnson's hip was not fractured, and Dr. Wolfe formed a diagnosis and determined appropriate treatment based upon that finding. Dr. Wolfe has shown that this initial diagnosis and treatment was not the product of deliberate indifference. *See Duckworth v. Ahmad,* 532 F.3d 675, 680 (7th Cir. 2008). ("The nub of this subjective inquiry is *what risk the medical staff knew of* and whether the course of treatment was so far afield as to allow a jury to infer deliberate indifference.") (emphasis added); *Estate of Cole v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996) (holding that deliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment); *see also Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002) ("[A] plaintiff claiming an Eighth Amendment violation must show the defendant's actual knowledge of the threat to the plaintiff's health or safety, the defendant's failure to take reasonable measures, and the defendant's subjective intent to harm or deliberate indifference."). Dr. Wolfe was entitled to rely on the x-ray report in forming a diagnosis and treatment plan at this time.

It is disputed, however, whether Dr. Wolfe was deliberately indifferent to Mr. Johnson's condition when Mr. Johnson complained of continued pain after falling in the shower in late

August of 2012. Mr. Johnson reported to Dr. Wolfe on August 24, 2012, that he fell the night before getting out of the shower and had been on crutches with some weight bearing. Dr. Wolfe ordered a medical lay-in with meals and medications delivered for one month, scheduled Mr. Johnson to be seen by chronic care, continued Naprosyn, and ordered Tegretol for pain. Dr. Wolfe noted that Mr. Johnson's previous x-rays showed degenerative joint disease of the hip and spine, and, at this time, he believed that Mr. Johnson's complaints were a continuation of problems reported in early August. Dr. Wolfe did not order further x-rays of Mr. Johnson's hip at this time, despite the fact that Mr. Johnson had fallen and now needed crutches in order to ambulate. Mr. Johnson saw Dr. Wolfe again on September 24, 2012, still complaining of pain and instability. While Dr. Wolfe states that he believed that Mr. Johnson's pain had improved, Mr. Johnson asserts that he was still in extreme pain. Thus, there is a dispute of material fact regarding Mr. Johnson's level of pain at this time. Dr. Wolfe again continued the same course of treatment by renewing the medical lay-in. It was not until November 9, 2012, when Mr. Johnson saw Dr. Wolfe again complaining of pain and the inability to stand, that Dr. Wolfe ordered further testing which eventually led to the discovery of Mr. Johnson's broken hip. A reasonable jury could find that Dr. Wolfe exhibited deliberate indifference to Mr. Johnson's condition by failing to conduct further investigation of Mr. Johnson's injuries when he fell in the shower on August 23, 2012. Dr. Wolfe's motion for summary judgment on Mr. Johnson's deliberate indifference claim must therefore be **denied**.

### B. Negligence

The Corizon defendants also argue that they are entitled to summary judgment on Mr. Johnson's negligence claim because he failed to submit his claim to a medical review panel as

required by the Indiana Medical Malpractice Act[4] and because Mr. Johnson has presented no expert testimony to establish the applicable standard of care and that the defendant's conduct fell below that standard.

Mr. Johnson's negligence claim is based on Indiana law. Under Indiana law, to show negligence, a plaintiff must show: (1) a duty to conform one's conduct to a standard of care arising from the relationship with the defendant, (2) a failure to conform one's conduct to the standard of care required, and (3) an injury caused by the failure. *Perkins v. Lawson*, 312 F.3d 872, 876 (7th Cir. 2002). In a medical malpractice case, "expert medical testimony is usually required to determine whether a physician's conduct fell below the applicable standard of care." *Bader v. Johnson*, 732 N.E.2d 1212, 1217-18 (Ind. 2000); *see also Musser v. Gentiva Health Servs.*, 356 F.3d 751, 753 (7th Cir. 2004) ("[U]nder Indiana law a prima facie case in medical malpractice cannot be established without expert medical testimony."). "This is generally so because the technical and complicated nature of medical treatment makes it impossible for a trier of fact to apply the standard of care without the benefit of expert opinion on the ultimate question of breach of duty." *Bader*, 732 N.E.2d at 1217-18. Expert testimony is required unless the defendant's conduct is "understandable without extensive technical input" or "so obviously substandard that one need not possess medical expertise to recognize the breach." *Gipson v. United States*, 631 F.3d 448, 451 (7th Cir. 2011) (quoting *Narducci v. Tedrow,* 736 N.E.2d 1288, 1293 (Ind. Ct. App. 2000)).

Here, Nurse Blomquist and Dr. Wolfe argue that the care they provided met the standard of care and that he did not breach any duty to Mr. Johnson. Mr. Johnson argues that expert

---

[4] The Corizon defendants have provided no evidentiary support, but Mr. Johnson does not dispute, that his medical malpractice claim must fail because he has not complied with the Indiana Medical Malpractice Act. *See Hines v. Elkhart Gen. Hosp.*, 603 F.2d 646, 647 (7th Cir. 1979).

12

testimony is not necessary because his claims are within the knowledge of lay people. But the Court cannot say that the proper course of treatment for hip pain when the original x-ray is negative for a fracture is so obvious as to be within the understanding of lay people. Expert testimony is therefore required. Because Mr. Johnson has provided none, Nurse Blomquist and Dr. Wolfe are entitled to summary judgment on Mr. Johnson's negligence claim.

Finally, although Indiana tort law recognizes *respondeat superior* liability, because Mr. Johnson's negligence claims fail against Nurse Blomquist and Dr. Wolf, they must also fail against Corizon itself.

### IV. Conclusion

For the foregoing reasons, the Corizon defendants' motion for summary judgment [dkt 40] is **granted in part and denied in part.** The motion is **granted** as to all claims against Nurse Blomquist and Corizon. The motion is also **granted** as to Mr. Johnson's negligence claim against Dr. Wolfe. The motion is **denied** as to Mr. Johnson's deliberate indifference claim against Dr. Wolfe. No partial final judgment shall issue as to the claims resolved in this Order.

**IT IS SO ORDERED.**

Date: 04/14/2015

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Ricky D. Johnson
922973
Miami Correctional Facility
3038 West 850 South
Bunker Hill, IN 46914

All electronically registered counsel

13